MOORE *v.* FLINT & PERE MARQUETTE RAILROAD CO. [1]

CONTRACTS—EVIDENCE.

 Plaintiff voluntarily prepared and submitted to the general solicitor of the defendant railroad company a plan for new terminal and depot facilities in a certain city. In the course of sundry correspondence and conversations with the solicitor, who, to plaintiff's knowledge, had no authority to bind the company by a contract to buy the plan, plaintiff was given to understand that, in case his plan should be adopted, he would be given employment in the way of negotiating for the required lands, on a basis of compensation which would guarantee to him a sum corresponding with the value placed by him upon the plan. The plans were afterwards submitted to the defendant's president, and he, while engaged in their examination, either by word or nod indicated acquiescence in plaintiff's statement as to the substance of the previous negotiations with the general solicitor. *Held*, not to amount to an agreement by the company to pay plaintiff for the plan if used.

---

[1] Rehearing denied June 28, 1898.

Error to Wayne; Hosmer, J.  Submitted January 7, 1898.  Decided March 15, 1898.

*Assumpsit* by George William Moore and George Whitney Moore against the Flint & Pere Marquette Railroad Company for services rendered.  From a judgment for defendant on verdict directed by the court, plaintiffs bring error.  Affirmed.

*Elliott G. Stevenson*, for appellants.

*Hanchett & Hanchett* (*H. M. Campbell*, of counsel), for appellee.

MONTGOMERY, J.  The plaintiffs' bill of particulars is as follows:

"For services rendered to defendant in the preparation of a plan for securing for it an independent entrance into the city of Detroit, and for a union depot in connection with the Canadian Pacific, Detroit, Lansing & Northern, and other railroads_____ $10,000

"For the value of plan submitted and accepted by the defendant for securing an independent entrance into the city of Detroit by the Flint & Pere Marquette Railroad Company, in connection with the Canadian Pacific and Detroit, Lansing & Northern and other railroads, and for joint terminal and depot facilities in connection therewith_____ $10,000"

At the close of the testimony, the circuit judge directed a verdict for the defendant, and the plaintiffs bring error.

The plaintiffs' testimony tended to show the following state of facts: The defendant company had, prior to the opening of the correspondence between the parties, been running trains into Detroit over the track of the Michigan Central Railroad Company, and it was considered desirable that terminal facilities independent of that company be secured.  The defendant's board of directors had considered the subject, and had had some negotiations with the officials of the Detroit, Grand Haven & Milwaukee

Railroad Company looking to that end, but nothing had come of the negotiations. Prior even to this—*i. e.*, October 14, 1881—a committee on independent Detroit terminals had been appointed, which committee, it would appear, had been continued up to and including the transactions with plaintiffs. Plaintiffs' testimony tends to show that in 1885 or 1886 they had talked with Mr. Webber, the general solicitor of defendant, and told him that they were figuring on a plan for getting his road an independent entrance into the city. The various routes into the city suggested by plaintiffs were not adopted, but the plaintiffs' claim is that the idea or plan of plaintiffs as to the manner of securing terminal facilities was adopted; that this plan included co-operation with other railroads, and the building of a union depot to the terminal finally settled upon; and that, while the precise route was not followed out, the general plan was.

It becomes necessary to consider somewhat at length the communications which passed between the parties, and, when letters appear, they are referred to as more reliable than the recollections of witnesses. On February 12, 1887, plaintiffs, having had, as before stated, some talk with Mr. Webber, wrote him at New York, where he then was attending a meeting of the directors, inclosing a map, and in the letter elaborating somewhat the plans which they had, including the suggestion of a route, and uniting the Flint & Pere Marquette with the Wabash, Canadian Pacific, Detroit, Lansing & Northern, and Toledo, Ann Arbor & North Michigan railroads in constructing a union depot. This letter concluded as follows:

"If the substance of this plan is adopted, we shall expect to do such portions of the work as come in our line."

On March 3d, plaintiffs again wrote Mr. Webber, suggesting the purchase of five blocks at the place designated in this plan, and saying:

"We have an appraisement of all the property needed, the grade of all the different streets by and over which it

is proposed to pass, and a crude plan for entering the city, including the railroad grade to and in the new depot. * * * Should you desire it, we should be pleased to go with you over the ground, show you the location, and explain our plan in detail."

To this Mr. Webber replied as follows:

" On my return home, I find your letter of March 3d. Can you give me an approximate idea of the area embraced in the property you mention, and the price at which it can be purchased? What would be your charge if you should undertake this for us, and secure options, as suggested?"

Two things are apparent from this correspondence, namely, that up to this time neither party had understood that the plaintiffs were employed by defendant, and that Mr. Webber understood that the employment contemplated by them was to be in the work of making purchases of property necessary to carry their plan into effect if their scheme were adopted. It would appear that the plan had been freely exhibited with that end in view. This is emphasized by plaintiffs' next letter, under date of March 8th, in which they say:

"Regarding our charge, we would prefer to take that in the shape of an interest in the enterprise. We will furnish you with all the facts upon which we made our estimate of values, and show you the land and the plan, from which you can judge of the cost, and determine the desirability."

Again, on the 29th of March, plaintiffs wrote Mr. Webber as follows:

"We have been informed in a somewhat confidential manner that your road has or is about to close a contract for permanent terminal facilities here. How accurate our information is, or why the party who gave us the information did so, we are unable to state. But, if we are correctly informed, your people would doubtless not care to interest themselves in any other terminal. We do not wish to be understood as urging you to make any decision in regard to our proposition, but if your decision has been made, or when made, we would be pleased to learn of it as soon as it may suit your convenience."

This letter was referred to Mr. Potter, the vice-president and general manager of the defendant, who wrote in reply:

"Yours of 29th to Mr. Webber is referred to me. I think he showed me some previous correspondence from you on the same subject. The policy of the company is not yet decided as to Detroit terminals; but it is likely to be within 30 days. The map you sent to Mr. Webber opened some troublesome questions, such as the crossing of the Michigan Central Railroad, either at grade or over if practicable. I will see you before anything is done."

Not having heard further from Mr. Potter, plaintiffs again wrote him, on June 2d, as follows:

"We would like to ascertain whether the question has been settled or not, and, if not, would your company feel disposed to consider further the combination suggested.'

In reply to this, Mr. Potter wrote, on June 3d:

"On account of the absence of our president, Mr. Crapo, who is on the Pacific Coast, no meeting of the directors will be held prior to the last week in June, and then in New York, when, if you will send me details of your plan, I will submit it."

Plaintiffs replied, inclosing map, and giving details of this plan, and saying that a member of plaintiffs' firm would probably be in New York the last week in June, and that, if desired, he would appear before defendant's board, and explain the plan in detail. This meeting was not arranged, and here the correspondence dropped until August 10, 1888, when plaintiffs again wrote Mr. Webber as follows:

"We would like to see you at your earliest convenience. We think we have something that would be of interest to your railroad. About when will you be in the city, and could we have a short interview with you at that time?"

Mr. Webber replied:

"I will be at the Russell House at 9 o'clock tomorrow morning. Would like statement in writing to take East with me."

Mr. George William Moore was at this time in New

York, and, the contents of Mr. Webber's letter having
been telegraphed to him, he wrote a brief sketch of his
plan, and sent it to Mr. Webber, at the Windsor Hotel,
New York.   To this Mr. Webber replied on August 16th :

"Letter rec'd.   Favorable consideration.   Make lists of
descriptions for sale, with estimates of cost.   Will return
home Saturday, and call on you if possible."

On the 17th he telegraphed :

"Will call on you Saturday, at 3, standard time."

It will be noticed that up to this date the plaintiffs had
put Mr. Webber and Mr. Potter in possession of their
plan, and their negotiations had been with reference to
inducing defendant to join a combination in which the
plaintiffs should take an interest, or, in case the defendant
should propose to carry out the scheme, to obtain employ-
ment in the work of securing the necessary property.
The negotiations had not included any proposition to buy
or sell the plan.   The plaintiffs were working to promote
an enterprise on joint account, or an enterprise which, if
undertaken by defendant alone, should furnish them em-
ployment.   For the purpose of doing this, and not under
any promise, express or implied, that they should be com-
pensated for the plan, they had freely exhibited it.   There
were no fiduciary relations between the parties.   There
was nothing which precluded the defendant from adopting
the plan, which consisted in the main of a proposition to
run its road at grade or above grade to a desirable
terminus, buy the property necessary to do so, and induce
other railroads to join in building a union depot.   Had
the negotiations ended here, it would have been too clear
for discussion that the defendant was left at liberty to join
in such an enterprise with any persons or corporations
whom it might choose, and that the plan of plaintiffs did
not stand in the way.   If any promise or undertaking of
the defendant whatever can be implied, it was a promise
to furnish employment or to join plaintiffs in the enter-
prise, neither of which promises is counted on or within
the bill of particulars.

Shortly after the 17th of August, 1888, Mr. Webber called on Mr. George William Moore, and it is contended that at this time there was an agreement made by him to pay for the plan in case it was used by defendant. The testimony of Mr. Moore on his direct examination is as follows:

"We went over the matter somewhat in detail, and then he said: 'The board wanted me to ask you what your charges would be in cash.' I said: 'If our plans are adopted, I think we ought to have $10,000.' He said: 'Well, we, as directors, are trustees for our stockholders, and we have to give an account of what we do; and the board think they would rather pay you by having you extend your work, or by way of negotiating for the land; and we would like to know what you would charge us in case we extend your work, and have you negotiate for purchasing the necessary land for a station.' I replied: 'That, of course, would depend on the value of the land you buy.' He said he would like to have us fix our compensation as a percentage upon the assessed value of the land, adding as his reason that in that way the compensation could be definitely fixed, and we would not then be interested in the price they might have to pay. He explained that, if our compensation was fixed by the amount paid, we would be interested in increasing the price. He said: 'Of course, we know you would not do that; if we thought you would, we would not suggest your acting for us; but it would impair, to some extent, your usefulness, because, if you should disagree with us as to what we ought to pay as a settlement, we could not, perhaps, disimbue our minds entirely of the fact that you would get a greater compensation if your suggestion was adopted. Besides, it relieves you and ourselves from any embarrassment, and enables us to go forward with the work without any idea on the part of anybody that it made any difference what prices were paid.' I told him that would be satisfactory, but that a percentage on the assessed value would be necessarily higher than the percentage based upon the price paid for the land. He said, 'Certainly.'

"We looked over the papers there, and I had at that time the list of quite a large amount of property, and we ran it over together to see how much the depot company would probably take, and I said to him: 'I should think, Mr. Webber, you would probably want this property that

is assessed somewhat over $300,000.    I think it is $330,000, or in that neighborhood.'    And I said: 'If we negotiate for this land, I think we ought to have 4 per cent. of the assessed value.'    He said he did not know but that would be fair enough.    I said: 'Mr. Webber, you have your own attorneys and your own landmen, and perhaps you would not want our services.'    I told him that 'at first we were inclined to think that we ought to have the conducting of these negotiations, but, upon reflection, we thought perhaps that you would prefer to do it yourself.'    'Well,' he said, 'our present impression is that we would like to have you take hold of it.    However,' he said, 'that will be a matter of the future.'    I said: 'Mr. Webber, if you want us to negotiate, we will be at your service; but we will expect you to take land enough so that 4 per cent. of the assessed value will amount to $10,000.    If you take land that the commission exceeds $10,000, we will expect an increased compensation.'    He said, 'Certainly.'    The conversation lasted perhaps an hour and a half.    I am giving it very briefly.    Before going away, the ultimate agreement was that, if we did not negotiate for the land, we were to have $10,000.    If we did negotiate for the land, we were to have 4 per cent. of the assessed value, and they were to take land enough so that our commission would amount to $10,000.    It might amount to more than that, and, if it did, we were to have the increased sum."

We have quoted this testimony at length for the reason that we think, taken as a whole, the statement of the conclusion at the close of the testimony is shown by the text of the conversation to have been inaccurate.    Mr. Webber's testimony is that he made no agreement to pay for plans, and that he had no authority to make such an agreement, and plaintiff's testimony, as a whole, indicates that limitations of the authority of Mr. Webber were brought home to him.    He says Mr. Webber stated:

"We, as directors, are trustees for our stockholders, and we have to give an account of what we do; and the *board think they would* rather pay you by having you extend your work, or by way of negotiating for the land; and we would like to know what you would charge us in case we extend your work, and have you negotiate for purchasing the necessary land for a station."

That plaintiffs understood that this was the limit of Mr. Webber's authority, and that, if any contract was made, it was in the line of that talk, is *evident* from the following letter written by Mr. Moore, September 23, 1889:

"HON. WILLIAM L. WEBBER,
          "East Saginaw, Mich.

"*Dear Sir:* We originated a plan for a railroad station at Detroit, upon which we spent a great deal of time and some money, and presented it to you, and you told us, if adopted, we should have the business of purchasing the land that should be selected, and our commission to be 4 per cent. on the assessed value of the land purchased, which we both thought would amount to about $10,000. We see from the papers our plan has been adopted, and we hope to hear from you very soon in regard to that portion of the understanding in which we are personally and financially interested.

                         "Very truly yours,
                              "MOORE & MOORE."

As before stated, Mr. Webber testified that he had no authority to make such a contract as plaintiffs now allege. The only other person with whom they are said to have negotiated is Gov. Crapo. Mr. Moore testifies on his direct examination that he told Mr. Crapo briefly the talk he had with Mr. Webber, and then testifies as follows:

"I do not think Mr. Crapo made any remark to that, except he just nodded his head, and said, 'Yes, yes,' or something of that kind. He paid very little attention to that part of it. He simply was watching these maps, and he asked, I should say, 500 questions."

On cross-examination he testified as follows:

"*Q.* What did Mr. Crapo say to you when you related to him the conversation which you say you had with Mr. Webber?

"*A.* I don't think he made any reply except, 'Yes, yes;' just 'Yes,' and nodded his head, and went right on looking at the maps. I did not have any discussion. Mr. Crapo did not seem to be particularly interested in the question of compensation. He was very much interested in the plan.

"*Q.* Then you did not understand him to say anything on the subject?

"*A.* All he said was, when I told him, he said, 'Yes.' That is all.    He entered into no discussion with me about compensation, but he did enter into a very extended discussion of the plan.

"*Q.* What was it he said 'Yes' to?

"*A.* Why, I told him what I had told Mr. Webber.

"*Q.* And, when you told him that, he says, 'Yes, yes, yes?'

"*A.* He said, 'Yes.' That is my recollection now. Just nodded 'Yes,' and went right on.

"*The Court:* Did he nod 'Yes,' or say 'Yes?'

"*A.* Well, I think he did both,—would be my recollection now.    Of course, it is a long time ago.    I remember the acquiescence in the statement, but I don't remember the details of it.    It would be impossible."

We do not think this conversation can be construed as a promise to pay by the railroad company.    There is nothing in the language employed or the nod of the head showing any more than acquiescence in the statement of the fact that such a conversation had occurred between Mr. Webber and plaintiff.    We think no such agreement as counted on was shown, and that the judgment should be affirmed.

The other Justices concurred.